UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
K.A. and D.S., individually and on behalf of a class of
all others similarly situated,                                                    18 Civ. 3858 (ALC) (HBP)

                               Plaintiffs,                  **AMENDED
CLASS ACTION COMPLAINT**

      - against -

THE CITY OF NEW YORK, NEW YORK CITY                   Jury Trial Demanded
HEALTH AND HOSPITALS CORPORATION,
PHYSICIAN AFFILIATE GROUP OF NEW YORK, P.C.,
ANASTASIA BLACKMON, and DR. "JANE" VESSEL,

                              Defendants.
------------------------------------------------------------------X

## PRELIMINARY STATEMENT

      Plaintiffs K.A. and D.S. bring this class action on their own behalf and on behalf of all others similarly situated. The plaintiffs and putative class members are women presently or previously confined to the custody and care of the New York City Department of Correction at its Rose M. Singer Center ("RMSC") located at Rikers Island.

      Defendants maintain the unconstitutional policy, custom and practice of denying and/or delaying female prisoners' access to timely medical care by failing to employ and staff the RMSC clinic/infirmary with an adequate and appropriate number of female medical chaperones to accompany female prisoners undergoing an "intimate examination" (defined as "any examination, investigation or treatment that involves the rectum, genitalia or breasts)," thus unnecessarily endangering the prisoner and needlessly requiring her to assume the risks associated with (a) waiting hours/days/weeks for a female doctor or chaperone to become available while risking the degenerative effects of prolonged lack of treatment for her medical

condition or (b) proceeding with the unchaperoned examination while risking sexual assault, abuse and harassment by the male healthcare professional during the unchaperoned examination.

Additionally, Defendants' failure to provide the plaintiffs and putative class members with female medical chaperones for intimate examinations, as required by written policy, has directly enabled male healthcare professionals assigned to RMSC to engage in the sexual assault, abuse, and harassment of the plaintiffs and putative class members. Despite the defendants being aware of a general risk of sexual victimization by male healthcare professionals on female prisoners and a specific risk of sexual victimization by certain healthcare professionals on certain prisoners, the defendants failed to protect the plaintiffs and putative class members from the known and obvious risks associated with assigning, directing, and allowing male healthcare professionals to perform unchaperoned examinations on female prisoners. Defendants are aware of historical and continued evidence of sexual misconduct by male healthcare professionals against female prisoners at RMSC.

As a direct and proximate result of Defendants' failure to have female chaperones available to the plaintiffs and putative class members, these prisoners, on occasion, refused medical examinations, thus causing their condition to deteriorate and them to suffer physical injuries, emotional distress, and other damages. Likewise, as a direct and proximate result of Defendants' failure to have female chaperones available to the plaintiffs and putative class members, these prisoners, on occasion, proceeded with unchaperoned intimate examinations, during which they were sexually assaulted, abused, and harassed by male healthcare professionals, thus causing them to suffer physical injuries, emotional distress, and other damages.

Plaintiffs and the putative class members bring this action for injunctive and declaratory relief, and for money damages, to redress defendants' violations of their rights under the First, Fourth, Eighth, and Fourteenth Amendments of the United States Constitution.

New York State has recognized the coercive power jail and prison staff wield over incarcerated individuals, and the related risks of rape and other sexual abuse, by criminalizing all sexual activity between incarcerated individuals and facility staff in New York Penal Law §§130.05(3)(f), 130.25(1), and 130.40(1). The defendants are aware that New York State has identified a significant risk of sexual coercion of individuals in custody, but they nonetheless failed to take any reasonable measures or precautions to protect these vulnerable prisoners.

## JURISDICTION AND VENUE

1. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§1331 and 1343(a)(3) and (4). Plaintiffs seek declaratory relief pursuant to 28 U.S.C. §2201.

2. This action seeks redress under the color of statute, ordinance, regulation, custom or usage of rights, privileges and immunities secured to the plaintiffs and putative class members by the First, Fourth, Eighth and Fourteenth Amendments of the Constitution of the United States, Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12101 et seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. §794.

3. Plaintiffs' claim for attorney's fees and costs is predicated upon 42 U.S.C. §1988, which authorizes the award of attorney's fees and costs to prevailing plaintiffs in actions brought pursuant to 42 U.S.C. §1983.

4. Venue is appropriate in this Court pursuant to 28 U.S.C. §1391(b)(2), as a substantial part of the events or omissions giving rise to this claim occurred within Bronx County, New York, which is within this judicial district.

## PARTIES

5.      At all times mentioned herein, plaintiffs K.A., D.S., and the putative class members are women presently or previously confined to the custody and care of the New York City Department of Correction.

6.      Upon information and belief, and at all times mentioned herein, defendant City of New York (hereinafter referred to as the "City") was and remains a body corporate and politic, constituting a municipal corporation, duly organized and existing under and by virtue of the laws of the State of New York.

7.      Upon information and belief, and at all times mentioned herein, the City operates the New York City Department of Health and Mental Hygiene (hereinafter referred to as the "DOHMH") pursuant to law.

8.      Upon information and belief, and at all times mentioned herein, the City operates the New York City Department of Correction (hereinafter referred to as the "NYCDOC") pursuant to law.

9.      Upon information and belief, and at all times mentioned herein, defendant New York City Health and Hospitals Corporation ("NYCHHC") is a municipal corporation organized and existing by virtue of the laws of the State of New York.

10.      Upon information and belief, and at all times mentioned herein, defendant Physicians Affiliate Group of New York, P.C. ("PAGNY") is a domestic professional corporation organized and existing by virtue of the laws of the State of New York.

11.      At all times mentioned herein, defendants NYCHHC and PAGNY, their site medical directors, physicians, nurses, physician assistants, clinicians, therapists, and other medical staff (collectively, "healthcare professionals"), provided medical, mental health, dental

and ancillary services to prisoners at Rikers Island pursuant to a contract with the City of New York and/or DOHMH. In carrying out their duties, NYCHHC and PAGNY are required to ensure that their policies, practices and procedures, as well as the personnel they employ in the City's jails and hospital prison wards, comply with all City, NYCDOC and DOHMH policies, the City's Minimum Standards for Health Care, and local, state and federal law.

12.     Prior to NYCHHC and PAGNY being retained by the City and/or DOHMH to provide all medical, mental health, dental and ancillary services to prisoners at Rikers Island, the City was contracted with Corizon, Inc. for such purposes.

13.     At all times mentioned herein, the City, NYCHHC and PAGNY were responsible for supervising and overseeing the hiring and supervision of RMSC's healthcare professionals.

14.     At all times relevant hereto, defendant Anastasia Blackmon ("Warden Blackmon") was the warden of RMSC. As Warden of RMSC, she was responsible for formulating policies, methods and procedures, and standards for care and treatment of this prisoners confined to RMSC; for the supervision of staff and inmates to ensure a safe environment, including the enforcement of NYCDOC, DOHMH and NYCHHC rules and regulations; the investigation of many complaints of sexual misconduct by staff; the investigation of and response to complaints of misconduct against staff, in conjunction with NYCDOC's Inspector General's Office and prosecutors; the training of staff; the review of decisions to place male healthcare professionals in a female-only jail; and for decisions concerning the numbers of and assignment of staff, including whether to remove staff from contact with female prisoners. Despite receiving grievances and complaints that no female medical chaperones were available, that the clinic was understaffed, and that officers were forcing prisoners to choose between an unchaperoned intimate examination and refusal of medical care, she failed to take appropriate

action to address the situation, leaving the plaintiffs and putative class members to be sexually assaulted, abused and harassed and/or their medical conditions left untreated.

15.     At all times relevant hereto, defendant "Jane" Vessel ("Dr. Vessel") was the chief medical officer of RMSC. As the Chief Medical Officer, Dr. Vessel was responsible for planning, reviewing, supervising, and controlling the medical and health services rendered at RMSC; formulating policies, methods and procedures, and standards for care and treatment; supervising methods of delivery and evaluating patient care; organizing and coordinating the services provided by healthcare professionals at RMSC; overseeing the surveillance and promotion of the healthcare professionals employed at RMSC; participating in administrative decision-making; recommending, approving, and implementing policies and procedures; communicating issues and concerns to RMSC, NYCDOC, NYCHHC, and PAGNY leadership when warranted; establishing and implementing policies, procedures, and guidelines designed to assure a safe clinic experience at RMSC and the provision of adequate, comprehensive services thereat; supervising, evaluating, and training subordinates assure a safe clinic experience at RMSC and the provision of adequate, comprehensive services thereat; and provide direct oversight of staffing decisions including staff management practices to ensure adequate staffing at the RMSC clinic and availability of female chaperones during all shifts.

16.     Upon information and belief, and at all times mentioned herein, the City and NYCDOC owned, operated, maintained, managed, supervised, directed and controlled the jail facilities located within the City of New York, including but not limited to RMSC.

17.     Upon information and belief, and at all times mentioned herein, NYCHHC and PAGNY operated and maintained the clinic/infirmary within RMSC, where prisoners housed in said facility can seek medications, medical examinations, care and treatment.

## STATEMENT OF FACTS

18.     Pursuant to DOHMH Correctional Health Services ("CHS") Policy #MED 2C

issued October 13, 2010 by CHS Medical Director Homer Venters, M.D.,

**POLICY:**

Any healthcare professional undertaking an intimate examination (defined as any examination, investigation or treatment that involves the rectum, genitalia or breasts) will do so with the presence of a chaperone.

**PURPOSE:**

*Due to the nature of intimate examinations, there are occasions where there is the potential for abuse of a person in a vulnerable position*, and, conversely, for false allegations to be made. The purpose of this policy is to promote a comfortable setting for patients and to protect both patients and staff from abuse or allegations of abuse.

**PROCEDURES:**

1. The clinician responsible for the clinical encounter is responsible for securing a chaperone. A chaperone is a member of the clinic staff who is present for a clinical encounter that involves an intimate examination. When possible, the chaperone should be the same gender as the patient; however, the lack of a same gender chaperone should not preclude the use of a chaperone.

2. The chaperone may be part of the clinical encounter. Chaperones may assist with the clinical encounter if appropriate to their level of training and job title.

3. In the case of a medical emergency, if no chaperone is available to conduct the examination, the provider may proceed absent a chaperone provided that the clinician fully documents the circumstances in the medical record.

4. The name of the chaperone attending a clinical encounter must be entered as part of the medical documentation of the encounter by the M.D. or P.A. or nurse who is responsible for documenting the encounter.

(emphasis added)

19.     On or about November 14, 2014, CHS Medical Director Ross MacDonald, M.D.

revised DOHMH/NYCHHC Policy #MED 2C as follows:

**POLICY:**

*To safeguard patients from potential abuse* and to safeguard providers from false allegations of abuse, any healthcare professional undertaking an intimate examination (defined as any examination, investigation or treatment that involves the rectum, genitalia or breasts) will do so with the presence of a chaperone.

(emphasis added)

The "Purpose" section of the policy was removed in the revision. The "Procedures" section was left unchanged.

20.     Given the policy, the defendants know that female prisoners are at risk of sexual assault, abuse and harassment by healthcare professionals, yet they failed to take necessary and appropriate action to protect the plaintiffs and putative class members.

21.     In addition, the American Medical Association has issued numerous Code of Medical Ethics Opinions stating that medical providers should adopt policies that make chaperones available (irrespective of the appointment requiring an intimate examination) upon patient request, that the provider always honor the patient's request to have a chaperone, and that the provider have an authorized member of the healthcare team serve as a chaperone.

22.     In Estelle v. Gamble (1976), the Supreme Court held that the deprivation of health care to prisoners constituted cruel and unusual punishment. Since then, jails and prisons are mandated to provide all persons in custody with access to timely and appropriate medical care and a professional medical opinion. Additionally, jails and prisons are required to provide prisoners with medical care equivalent to that dispensed to the general public.

23.     Due to the coercive nature of jail and prison settings, female prisoners cannot consent to sexual activity while confined to the care and custody of a state or local correctional facility. This incapacity to consent is recognized by N.Y. Penal Law §130.05(3)(f).

24.     It is well-documented that correctional staff and jail healthcare professionals have subjected female prisoners to recurrent and ongoing acts of sexual misconduct at RMSC. These include forcible rape, sexual intercourse, anal intercourse, oral sexual acts, sexual touching, voyeurism, invasion of personal privacy, demeaning sexual comments, and intimidation.

25.     Defendants know that by allowing and assigning male healthcare professionals to perform unchaperoned intimate examinations on female prisoners places them at substantial risk of being sexually victimized; that sexual misconduct by staff is ongoing and recurrent; that victims of sexual abuse or harassment in a correctional setting are unlikely to come forward with complaints of such misconduct; and that defendants' policies and practices are grossly inadequate to prevent and remedy sexual misconduct. Despite the obvious nature of these risks and despite the recurrent incidence of sexual abuse and harassment by male healthcare professionals against female prisoners, Defendants have failed to take reasonable, necessary and appropriate steps to prevent and remedy such misconduct.

26.     Defendants know that by allowing and assigning male healthcare professionals to perform unchaperoned intimate examinations on female prisoners creates obvious risks of sexual activity and that the absolute disparity in power between male staff and female prisoners renders sexual activity between male staff and female prisoners inherently coercive.

27.     Defendants are aware of the substantial risk of sexual misconduct by male healthcare professionals upon female prisoners given their actual experience. Over the years, numerous female prisoners have credibly alleged to the defendants of that they were the victim of sexual abuse by male healthcare professionals at RMSC; male healthcare professionals at RMSC have been the subject of numerous internal investigations for engaging in sexual misconduct with female prisoners; numerous instances of sexual misconduct have been

substantiated; and numerous substantiated matters have been referred to the district attorney's office for prosecution.

28.     Despite these known risks and incidence of sexual misconduct by male healthcare professionals, the defendants, through their policies and practices, recklessly disregarded these risks and fail to protect the plaintiffs and putative class members from harm.

29.     Despite these known risks and incidence of sexual misconduct by male healthcare professionals, the defendants recklessly require the plaintiffs and putative class members to choose between the risk of denying and/or delaying medical care and the risk of being sexually victimized.

30.     Furthermore, as it is against the religious beliefs of the plaintiffs and some putative class members to be physically examined by a man who is not their husband (including healthcare professionals) alone, the defendants unlawfully require the plaintiffs and putative class members to choose between upholding their religious beliefs and the risk of denying and/or delaying medical care.

31.     Upon information and belief, the majority of healthcare professionals assigned to RMSC are male. Defendants have made insufficient efforts to hire female healthcare professionals, to limit the number of male healthcare professionals assigned to RMSC, to assign female healthcare professionals to RMSC, and to staff the clinic with adequate female healthcare professionals to act as medical chaperones during intimate examinations.

32.     Defendants fail to implement and enforce appropriate supervision by and of their staff so as to prevent and remedy staff sexual misconduct.

33.     Defendants fail to implement and enforce appropriate supervision by and of their

staff so as to prevent and remedy denial (actual and constructive) and/or delay of medical care to the plaintiffs and putative class members.

34.    Upon information and belief, Defendants have failed to enact adequate rules and policies to protect female prisoners from sexual innuendoes, vulgarity, degrading sexual comments, and propositioning, and to enforce those rules and policies that exist. For example, staff is not disciplined for violating these rules. As a result, such behavior by staff is commonplace, resulting in a hostile and sexualized atmosphere in which sexual harassment and abuse of female prisoners is more likely to occur.

35.    Defendants have failed to enact appropriate rules and policies to protect the health, security, religious, disability, and privacy rights of female prisoners and to enforce those rules and policies that exist, resulting in violations of these same rights. For example, male healthcare professionals perform unchaperoned intimate examinations on female prisoners against official policy and are not disciplined or reprimanded for such misconduct. In fact, NYCDOC and NYCHHC/PAGNY staff, rather than allow a prisoner to wait for a female chaperone to become available or request a chaperone on behalf of the prisoner, routinely pressure the plaintiffs and putative class members to waive their right to a chaperoned intimate examination in order to make their own lives easier (e.g., quicker clinic runs, do not have to bring the prisoner back another time, less paperwork, etc.). In doing so, NYCDOC and NYCHHC/PAGNY staff regularly force the plaintiffs and putative class members to choose between consenting to an unchaperoned intimate examination and going back to their cell without any examination.

36.    The defendant supervisory officials endorse such conduct in violation of formal

policy and have failed to take sufficient action when such conduct is brought to their attention and/or personally observed or to enforce policies intended to identify, address and prohibit this conduct.

37.     Plaintiffs K.A. and D.S. and the putative class plaintiffs are/were inmates confined to the custody, control and care of the New York City Department of Correction. While confined to RMSC, K.A. and D.S. and the putative class plaintiffs require(d) medical care. On countless occasions, K.A. and D.S. and the putative class members were forced to choose between an unchaperoned intimate examination by a male healthcare professional and foregoing her/their medical needs for days and weeks.

38.     K.A. and D.S., as well as dozens of other female prisoners, filed formal complaints and grievances with NYCDOC, NYCHHC/PAGNY, Warden Blackmon, and Dr. Vessel seeking relief from these unlawful practices. K.A. and D.S. and the putative class members have also complained to NYCDOC staff about these unlawful practices. K.A. and D.S. and the putative class members' complaints and grievances have been ignored and these unlawful practices have continued unabated.

39.     Upon information and belief, none of the defendants or their staffs have been disciplined as a result of K.A. and D.S. and the putative class members' complaints and grievances about these unlawful practices.

40.     K.A. and D.S. and many of the putative class members are prior victims of sexual abuse, occurring both in and out of custody. The defendants' unlawful practices have caused the plaintiffs and putative class members to suffer psychological and emotional distress, including depression, anxiety, nightmares, difficulty sleeping, and fearfulness of male officers and

healthcare professionals.

41.    The defendants' unlawful practices have also caused the plaintiffs and putative class members to needlessly endure preventable pain, suffering, physical injuries, and exacerbated and deteriorating medical conditions as they were forced to forego and/or delay intimate medical examinations due to the lack of female medical chaperones.

42.    The defendants' unlawful practices have also resulted in the plaintiffs and putative class members being sexually assaulted by male healthcare professionals during unchaperoned intimate examinations.

43.    Despite prior allegations of criminal conduct committed by male healthcare professionals at RMSC against female prisoners, including but not limited to sexual abuse and rape, bribery, beatings, passing contraband, threats, and coercing of statements and acts, as well as other unlawful conduct, the defendants have failed to adjust their staffing practices, install monitored security cameras, increase the degree of supervision thereat, and/or taken any other reasonable measures to provide greater security to female prisoners.

44.    Defendants' failure to provide female chaperones for intimate examinations and inadequate staffing and supervision of facility clinics makes it easy for male healthcare professionals to sexually coerce, touch, harass, assault, and rape the plaintiffs and putative class members.

45.    By causing, allowing, fostering and perpetuating a culture that turns a blind eye to female prisoner complaints of being sexually harassed by male correction and clinic staff (through e.g., lack of supervision, oversight, discipline, monitoring, change in policy and practice, etc.), the defendants created a reasonable belief amongst the plaintiffs and putative class

members that they would not be free from sexual harassment and abuse during unmonitored medical examinations of all types, regardless of whether it was an "intimate examination" or not.

46.     Plaintiffs and other prisoners have contemporaneously reported and subsequently grieved the defendants' failure to make female chaperones available for intimate examinations; however, an investigation was never conducted into these complaints nor was any action taken to ensure female chaperones were readily available to female inmates undergoing intimate examinations.

47.     The NYCDOC Department of Investigation ("DOI) has investigated allegations against male healthcare professionals, interviewed the victims and other witnesses, and issued reports about their findings, often times substantiating the allegations. DOI has referred these matters to the Bronx County District Attorney's Office, who has further investigated allegations, and who, at times, has decided to initiate a criminal proceeding against the offenders.

48.     Upon information and belief, the defendants have never terminated the employment of a male healthcare professional they determined to have committed sexual abuse on a female prisoner. Upon information and belief, Defendants have allowed these offenders to resign.

History of Sexual Abuse at RMSC

49.     According to a recent survey conducted by the U.S. Department of Justice's Bureau of Justice Statistics entitled *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011-12*, the Rose M. Singer Center had the highest rate nationally[1] (5.6%) of jail inmates reporting being coerced by facility staff in the previous 12 months (without any use or

---

[1] The Bureau of Statistics surveyed, *inter alia*, 52,296 jail inmates age 18 and older in 358 jails across the U.S.

threat of force), including being pressured or made to feel that they had to have sex or sexual contact with facility staff.

50.     Moreover, the DOJ survey found that 8.6% of RMSC inmates reported being sexually victimized[2] in the previous 12 months (compared to 3.2% nationally), with 5.9% reporting staff sexual misconduct[3] (compared to 1.8% nationally) and 5% reporting inmate-on-inmate victimization (compared to 1.6% nationally). Furthermore, 2.3% of RMSC inmates reported being physically forced by staff, 5.6% reported being pressured by staff, and 2.9% reported being sexually victimized by staff without force or pressure.

51.     Additionally, an August 4, 2014 report by the United States Attorney's Office for the Southern District of New York to the Mayor of the City of New York, Commissioner of the Department and Correction, and Corporation Counsel of the City of New York detailed the results of the Justice Department's investigation of the New York City Department of Correction jails on Rikers Island, conducted pursuant to the Civil Rights of Institutionalized Persons Act, and expressed "concern that DOC may be under-reporting sexual assault allegations."

52.     This underreporting of staff-on-inmate sexual assault is consistent with NYCDOC and DOHMH's culture of failing to report other abuses by staff. In his August 2014 report, the U.S. Attorney for the Southern District of New York stated,

> Additionally, in some cases, officers and supervisors pressure inmates not to report, using a phrase that is widely used and universally known at Rikers: "hold it down." This expression is code for, "don't report what happened." Inmates who refuse to "hold it down" risk retaliation from officers in the form of additional physical violence and disciplinary sanctions. A DOC Associate Commissioner acknowledged the

---

[2] The DOJ survey defines "sexual victimization" as "all types of sexual activity, e.g., oral, anal or vaginal penetration; hand jobs; touching of the inmate's buttocks, thighs, penis, breasts, or vagina in a sexual way; abusive sexual contacts; and both willing and unwilling sexual activity with staff."

[3] The DOJ survey defines "staff sexual misconduct" as including "all incidents of willing and unwilling sexual contact with facility staff and all incidents of sexual activity that involved oral, anal, vaginal penetration, hand jobs, blow jobs, and other sexual acts with facility staff."

underreporting of use of force by officers, noting that it would be "disingenuous" to claim that it doesn't exist. <u>The head of the Investigation Division also acknowledged</u> the problem.

A <u>senior DOHMH official told us that he also was very familiar</u> with the phrase, "hold it down," and conveyed his belief that adolescents were often instructed not to report incidents. He indicated that one of the reasons inmates might agree to "hold it down" was that if inmates do not report a use of force, they themselves were then less likely to be infracted and disciplined.

(emphasis added)

This suggests that the numerous instances of inmate sexual victimization by staff that have been reported represent only a small fraction of the actual sexual abuse that occurs on Rikers Island.

53.   Of those reported in recent years, RMSC has the highest incidence of sexual abuse and harassment allegations in the NYCDOC system – nearly double the next three highest facilities. According to NYCDOC's annual PREA Assessment Report dated August 14, 2018, there were 77 allegations of sexual abuse and harassment at RMSC between July-December 2017, representing 23.19% of all allegations at the City's jails. By comparison, AMKC and GRVC (both male facilities at Rikers Island) and the Brooklyn Detention Center (also a male facility) were in the second tier with 43, 42 and 44 allegations respectively. Between January-July 2018, 46 allegations of sexual abuse and harassment were made at RMSC, representing 20.09% of all allegations across the City's jails.

54.   Over recent years, female prisoners have filed hundreds of complaints, grievances, and lawsuits alleging sexual abuse by male healthcare professionals during medical examinations. One such woman, C.M., reported, "The doctors are far worse than the guards. Three women in the dorm had doctors stick their hands in their vaginas, claiming that their chromosomal charts were off and that he needed to perform a private examination of their

vaginal areas to determine whether they were men or women." She was warned to be careful around one particular doctor who the nurses called "Handsy."

55.     Plaintiff D.S. was confined to the defendants' custody, control and care at RMSC from January 22, 2018 through April 18, 2018. Prior to January 22, 2018, D.S. was the victim of sexual abuse, molestation, and rape. Defendants were on notice of her prior history of sexual abuse based upon information she provided during the intake phase.

   a. On January 31, 2018, D.S. was attacked by another inmate and re-injured her right shoulder where she previously had rotator cuff surgery on December 27, 2017. In the days and weeks thereafter, D.S. requested sick call and was presented to the RMSC clinic approximately 10-15 times for examination and treatment of pain in her shoulder, including evaluation of her post-operative sutures opening due to the assault. On these occasions, D.S. recalls being assigned to male physician's assistant Edzer Roche and male doctor "Jumo."[4] D.S. requested a chaperone and/or examination by a female healthcare professional each time since Mr. Roche and Dr. Jumo would insist that she remove her clothing for the shoulder examination. A chaperone or female health professional was never provided. D.S. recalls Mr. Roche and Dr. Jumo stating that they needed to examine her breasts as part of the shoulder examination. There was no medical basis for this. Rather, it was a pretext to their gratuitous fondling of her breasts on at least three (3) occasions. D.S. felt compelled to comply with Mr. Roche and Dr. Jumo's requests to examine her breasts as she was suffering a lot of pain and was desperately seeking a referral for an orthopedic consult and physical therapy.

---

[4] Edzer Roche and Dr. Jumo referred to themselves as doctors; however, records indicate that Edzer Roche is a physician's assistant and it is unclear at this time whether Dr. Jumo is actually a medical doctor.

b.  On several occasions, most notably March 2, 2018, D.S. was told by Mr. Roche

and/or Dr. Jumo that only male healthcare professionals were present and that if

she insisted on a chaperone or female healthcare professional she would not be

seen that day. Mr. Roche and/or Dr. Jumo also told D.S. that day that he had to

examine her <u>first</u> before he decided whether a chaperone would be necessary. As

the prior victim of sexual abuse, molestation and rape, D.S. felt extremely

uncomfortable disrobing in front of Mr. Roche and Dr. Jumo without a chaperone;

as a Muslim woman it was against her sincerely held religious beliefs to be

exposed in front of a man without a woman present. Accordingly, D.S. felt

compelled for her own safety and religious observance to leave the clinic without

examination or treatment, causing exacerbation of her shoulder pain and

deterioration of her condition. D.S. filed a grievance about this incident with

NYCDOC, deposited a letter to defendant Blackmon in her mailbox, and

deposited a letter to defendant Vessel in the clinic's "Second Chance Box."

Defendants did not respond to the grievance or letters prior to her transfer on

April 18, 2018.

c.  In late March 2018, D.S. requested sick call for a gynecological examination due

to bleeding, cramping and other concerns and requested a chaperone or female

healthcare professional for the examination. D.S. also requested same from the

FastTrack nurse at the RMSC clinic. When D.S. was taken to the clinic on or

about April 7th or 8th, no chaperone or female healthcare professional was present

for the examination. D.S. was told that no chaperones or female healthcare

professionals were staffed and that she had to choose whether to proceed with a

male healthcare professional. D.S. declined to proceed with a male healthcare professional for the reasons aforesaid and a Refusal of Medical Care form was generated by the male healthcare professional. D.S. did not refuse care; she only refused to undergo an unchaperoned intimate examination by a male healthcare professional as was her right. D.S. was returned to her housing unit and the defendants never rescheduled the appointment. As a result, D.S. continued to needlessly endure pain and suffering and deterioration of her condition.

56.     Plaintiff K.A. was confined to the defendants' custody, control and care at RMSC from September 20, 2017 through April 2018. Prior to September 20, 2017, K.A. was the victim of sexual abuse and rape, including but not limited to being sexually victimized by a male healthcare professional in the RMSC clinic several years prior, which was investigated and substantiated by NYCDOC. On several occasions during the incarceration period, K.A. presented to the RMSC clinic for sick call. K.A. would routinely be assigned to a male healthcare professional for examination. Knowing that she would be asked to remove her shirt during the examinations, K.A. would ask to be examined by a female healthcare professional and would be told none were available. K.A. would be told that no female healthcare professional were available. K.A. would then explain that she had been the victim of sexual abuse by a male physician's assistant in the RMSC clinic and request a chaperone in order to be seen by a man. K.A. was told that no chaperones were available either. K.A. would wait in the clinic for hours for a female healthcare professional and/or chaperone and would then sent back to the housing unit without examination. As a result, K.A. continued to needlessly endure pain and suffering and deterioration of her condition. On one occasion, on or about February 29, 2018, K.A. presented to the RMSC clinic due to the flu. As usual, K.A. requested examination by a female

healthcare professional or a chaperoned examination if with a man. Mr. Roche told K.A. and

other clinic personnel that she was a "troublemaker." After K.A. stated that she would submit a

complaint against the entire RMSC clinic staff, a female doctor was miraculously located to

examine K.A.

57.     Members of the putative class have also filed grievances and complaints with the

defendants detailing the allegations set forth herein. These women, as with K.A. and D.S., are

aware of the past history of sexual abuse by male healthcare professionals against female

prisoners in the RMSC clinic as well as their own personal observations and opinions that some

of the male healthcare professionals thereat act in an unprofessional manner and sexually

suggestive, and in some instances physically aggressive, inappropriate and abusive way towards

female prisoners.

> a.  Prisoner S.F. has been confined to the custody, control and care of the defendants
>
>     from March 8, 2017 through the date of this filing. During this time, S.F. has
>
>     presented to the RMSC clinic for numerous medical conditions requiring intimate
>
>     and non-intimate examinations. Each time S.F. was assigned a male healthcare
>
>     professional, often Mr. Roche, she requested a female chaperone and was told
>
>     none were available. S.F. then requested a female healthcare professional and was
>
>     told none were available. Due to personal concerns of safety, S.F. refused to be
>
>     physically examined during an unchaperoned examination by a male healthcare
>
>     professional. S.F. has submitted at least one grievance to NYCDOC regarding
>
>     same on or about March 1, 2018, but received no response or rescheduled
>
>     appointments. S.F. also sent a letter to Warden Blackmon and filed complaints
>
>     with 311 about these incidents where her requests for a chaperone and/or female

healthcare professional were refused. She has received no response to these either; however, she recently began to see notices in the examination cubicles advising inmates and staff about the availability of chaperones. Even after these notices, though, chaperones were not readily available and so she and other inmates would sit for hours on end in the clinic hoping a chaperone would arrive. Ultimately, they would give up and go back to their housing unit with medical attention.

b. On or about March 5, 2018, prisoner K.R. presented to the RMSC clinic for sick call and was assigned a male healthcare professional. K.R. requested a female chaperone and was told none were available. K.R. then requested a female healthcare professional and was told none were available, "Do you want to be seen or not?!" K.R. declined to be seen by a male healthcare professional due to her religious beliefs preventing her from being exposed to a man that is not her husband and was returned to her housing unit with her medical condition unresolved, to her physical detriment. K.R. submitted a grievance about this incident but received no response or rescheduled appointment.

c. Likewise, prisoner D.G. was confined to the custody, control and care of the defendants from November 6, 2017 to a date not presently known though at least into March 2018. During this time, D.G. presented to the RMSC clinic for numerous medical conditions requiring intimate and non-intimate examinations. Each time D.G. was assigned a male healthcare professional she requested a female chaperone and was told none were available. D.G. requested a female healthcare professional and was told none were available. Due to personal concerns of safety, D.G. refused to be physically examined during an

uncchaperoned examination by a male healthcare professional. D.G. has submitted at least one grievance to NYCDOC regarding same on or about March 8, 2018, but received no response or rescheduled appointments.

d.  Prisoner L.W. was confined to the custody, control and care of the defendants from November 2017 to a date not presently known. L.W. suffers from lupus and neuropathy and presented to the RMSC clinic for numerous medical conditions requiring intimate and non-intimate examinations during this time. Each time L.W. was assigned a male healthcare professional she requested a female chaperone and was told none were available. L.W. requested a female healthcare professional and was told none were available. Due to personal concerns of safety, her religious beliefs, and being a prior victim of sexual abuse, L.W. refused to be physically examined during an unchaperoned examination by a male healthcare professional. L.W. has submitted at least one grievance to NYCDOC regarding same, but received no response or rescheduled appointments.

e.  Prisoner A.S. was confined to the custody, control and care of the defendants from September 2017 to a date not presently known. A.S. presented to the RMSC clinic for numerous medical conditions requiring intimate and non-intimate examinations during this time. Each time A.S. was assigned a male healthcare professional she requested a female chaperone and was told none were available. A.S. requested a female healthcare professional and was told none were available. Due to personal concerns of safety, A.S. refused to be physically examined during an unchaperoned examination by a male healthcare professional. A.S. has

submitted at least one grievance to NYCDOC regarding same, but received no response or rescheduled appointments.

f.   Prisoner L.M. was confined to the custody, control and care of the defendants from December 2017 to a date not presently known. L.M. presented to the RMSC clinic for numerous medical conditions requiring intimate and non-intimate examinations during this time. Each time L.M. was assigned a male healthcare professional she requested a female chaperone and was told none were available. L.M. requested a female healthcare professional and was told none were available. Due to personal concerns of safety and her religious beliefs, L.M. refused to be physically examined during an unchaperoned examination by a male healthcare professional. L.M. has submitted at least one grievance to NYCDOC regarding same, but received no response or rescheduled appointments.

g.   Prisoner T.A. was confined to the custody, control and care of the defendants through April 25, 2018. T.A. presented to the RMSC clinic for numerous medical conditions requiring intimate and non-intimate examinations during this time. Each time T.A. was assigned a male healthcare professional she requested a female chaperone and was told none were available. T.A. requested a female healthcare professional and was told none were available. Due to personal concerns of safety and her religious beliefs, T.A. refused to be physically examined during an unchaperoned examination by a male healthcare professional. T.A. has submitted at least one grievance to NYCDOC and a 311 complaint regarding same, but received no response or rescheduled appointments. That grievance and 311 complaint stems from a March 5, 2018 clinic visit due to lower

stomach pains in which she waited 2½ hours for a chaperone and/or female healthcare professional before being sent back to the housing unit.

h. Prisoner T.W. was confined to the custody, control and care of the defendants from February 2018 through the date of this filing. T.W. presented to the RMSC clinic for numerous medical conditions requiring intimate and non-intimate examinations during this time. Each time T.W. was assigned a male healthcare professional she requested a female chaperone and was told none were available. T.W. requested a female healthcare professional and was told none were available. On one occasion, Mr. Roche told T.W. that if she wanted to see a female healthcare professional she had to wait until she was released. T.W. remains in the defendants' custody to date.

<u>Policy Ineffective To Prevent Sexual Abuse During Non-Intimate Examinations</u>

58.    In October 2009, N.D., a female inmate at RMSC, reported being groped by Dr. Franck Leveille, M.D., who was employed by PHS Medical Services, P.C. – DOHMH's contracted medical provider for the City's jails at the time. Upon information and belief, no administrative or criminal action was taken against him. In her civil suit filed the following year against *inter alia* Dr. Leveille and the City, N.D. testified that she was repeatedly groped by Dr. Leveille and that he fondled her breasts and rubbed his finger over her nipple during an unchaperoned medical examination in RMSC.

59.    In July 2010, Dr. Leveille was criminally charged and arrested for engaging in criminal sexual contact with a different female inmate (G.H.) in the RMSC clinic on March 28, 2010. Upon information and belief, Dr. Leveille fled the country and absconded from justice prior to trial. In her civil suit filed that year against *inter alia* Dr. Leveille and the City, G.H.

stated that she presented to the RMSC clinic because of a headache. In the unchaperoned examination cubicle, Dr. Leveille became aroused and began rubbing his genitalia. He then undid his pants, exposed his erect penis to G.H., and forced her to perform oral sex on him.

60.     Upon information and belief, these incidents were the catalyst to the issuance of CHS Policy #MED 2C on October 11, 2010; however, both of these incidents occurred during non-intimate examinations (intake procedure and headache, respectively). Thus, the October 11, 2010 chaperone policy and revised policy of November 14, 2014, which are limited to intimate examinations, would not have been applicable in the very situations they were borne from. Accordingly, the chaperone policy is unconstitutionally inadequate to reduce the risk of sexual abuse by male healthcare professionals against female prisoners as it is arbitrarily limited to intimate examinations when there is substantial evidence in the defendants' possession and public domain that sexual abuses can and have just as easily occurred during what are supposed to be "non-intimate" examinations.

61.     To that end, physician assistant Sidney Wilson, who was employed by Corizon, Inc., DOHMH's contracted medical provider for the City's jails at the time, sexually harassed, abused, and assaulted numerous female prisoners during what should have been "non-intimate" examinations.

a.   On approximately 8-10 occasions between October 4, 2013 and February 4, 2015, Mr. Wilson performed numerous unnecessary and unchaperoned internal pelvic examinations on K.A. for his own sexual gratification. K.A. had not presented to the clinic with any condition that required an intimate examination; however, Wilson would always insist upon these internal pelvic examinations as a pretext for him to insert his fingers into K.A.'s vagina.

b. On numerous occasions between July 21, 2014 and November 2014, L.R. would present to the RMSC clinic for sick call. On those occasions, regardless of the reason she was there, Mr. Wilson made sure that he was the one to "examine" her. A chaperone was never present. On these occasions, Wilson would instruct L.R. to remove her pants, expose her vagina to him, and he would then place his fingers inside her vagina in a sexual manner. On numerous occasions, Wilson had vaginal, oral and anal sex with L.R. in the RMSC clinic, sometimes with and other times without condoms.

c. In or about March 2014, S.A. presented to the RMSC clinic seeking a follow-up examination of her toe as she had had surgery on it shortly before. Despite presenting to the clinic for her toe, Mr. Wilson performed an unchaperoned examination on S.A. and told her to remove her clothes. Wilson then began rubbing S.A.'s breasts and inserted his fingers into her vagina. There was no medical basis for Wilson to touch S.A.'s breasts or vagina and it was done solely for his own sexual gratification. Upon S.A. asking Wilson why no nurse was present for this examination, Wilson responded that he likes S.A.'s appearance and that he can make things happen for her if she went along. Several weeks later, S.A. was taken to the clinic for a gynecological examination, even though she had recently had one during intake. S.A. declined the examination; however, Wilson stated that it was "procedure" and he had to do it. No chaperone was present for this examination. No medical instruments were used for this examination. Instead, Wilson used this as another opportunity to insert his fingers into S.A.'s vagina for his own sexual gratification. Thereafter, Wilson, always examining S.A. without a

chaperone present, touched, kissed, masturbated and otherwise sexually abused S.A. On at least one occasion, it appeared to S.A. that Wilson had ejaculated in his pants.

d.  On approximately five occasions beginning in early 2014 and continuing through December 31, 2014, L.J. presented to the RMSC clinic for sick call and was examined by Mr. Wilson. A chaperone was never present. During his examinations of L.J., Wilson caressed and groped L.J.'s arms, legs and shoulders in a sexual manner, resulting in him becoming aroused. While doing so, Wilson would make harassing sexual comments to L.J. to the effect that she had large breasts. On at least one occasion, Wilson performed an unnecessary and unchaperoned breast examination on L.J. for his own sexual gratification. Wilson did not have any medical basis to insist upon this breast examination. This was merely a pretext for Wilson to fondle L.J.'s breasts.

e.  Upon information and belief, at least three other women made similar complaints against Wilson.

62.  The aforesaid incidents involving Mr. Wilson were investigated and substantiated by DOI, referred to the district attorney's office for prosecution, and Wilson was indicted by a grand jury on numerous counts of having nonconsensual sexual contact with these women in the RMSC clinic. Mr. Wilson awaits trial.

63.  Pursuant to NYCDOC procedure, all new inmates are required to go through the intake process. As part of that process, detailed medical, psychological and social histories are taken from each inmate and medical examinations are performed. One of the questions asked of the plaintiffs and each of the putative class members is whether they were the victim of prior

sexual abuse. As prior victims of sexual abuse are at heightened risk of further sexual abuse, the defendants were aware that Plaintiffs and many of the putative class members were at a heightened risk for sexual victimization while in NYCDOC custody yet they failed to create and implement reasonable policies and practices to protect female prisoners from sexual victimization by male healthcare professionals.[5]

64.     Upon information and belief, the defendants have also received investigative reports and advocacy letters sent by government agencies and legal organizations that detail the disproportionate risk of sexual violence that female prisoners face in jail settings,[6] and have received and/or offered training that specifically details the disproportionate risk of sexual violence that female prisoners face in jail.

65.     Despite being aware of the foregoing, Defendants have failed to take reasonable measures to ensure the safety and security of female prisoners undergoing medical examinations by male healthcare professionals. Defendants have acted with reckless disregard for and deliberate indifference to the safety of Plaintiffs and the putative class members and have maintained unconstitutional policies, customs and practices that have led to sexual abuse, delayed medical care, and violations of religious beliefs.

## CLASS ACTION ALLEGATIONS

66.     Plaintiffs K.A. and D.S. bring this action on behalf of herself and all female prisoners formerly or presently confined to NYCDOC custody, control and care in the three (3)

---

[5] In the New York City Criminal Justice report of February 2018, defendant City acknowledges that 72% of the female jail population is designated as having a mental health need and that "the majority of women in jail have histories of trauma…"

[6] In his April 27, 2011 testimony to the Department of Justice and the Review Panel on Prison Rape, Jack Beck, Director of the Correctional Association of New York's Prison Visiting Project, stated that "Studies show that women with abuse histories are highly likely to be targeted for harassment and abuse, are statistically more likely to be re-victimized, and, when targeted, are especially prone to suffer symptoms of Post-Traumatic Stress Disorder. Because of the extraordinary rates of abuse histories among women in prison, women as a whole category are at particular risk of experiencing abuse in prison."

years prior to the filing of this action. This action is brought pursuant to the Federal Rules of

Civil Procedure, Rules 23(a), (b)(1), (b)(2) and (b)(3). The class meets the requirements of Rule

23 as follows:

    a.  <u>Ascertainable class</u>: The proposed class is ascertainable in that its members can be identified and located using information contained in Defendants' records kept in the ordinary course of their business, specifically inmate records and electronic medical records.

    b.  <u>Numerosity</u>: The potential number of members of the class is so numerous that their individual joinder herein is unfeasible and impracticable. Upon information and belief, members of the class number in the thousands. The precise number of class members and their identities are unknown to Plaintiffs at this time but are believed to be in excess of 10,000 members.[7] The membership of the class continually changes, rendering joinder of all members impracticable. The disposition of their claims through this class action will benefit both the parties and the Court. Class members may be notified of the pendency of this action by mail and/or publication through the records maintained in the ordinary course of business by Defendants.

    c.  <u>Typicality</u>: The claims and damages of the named plaintiffs are typical of the claims and damages of the class. Common questions of law and fact exist as to all class members and predominate over questions affecting only individual class members. Common legal and factual questions include, but are not limited to (a) whether the defendants' policy, pattern and practice of failing to provide female chaperones for intimate examinations is unconstitutional, (b) whether the defendants' policy, pattern and practice subject female prisoners in NYCDOC custody to a substantial and unreasonable risk of sexual abuse and assault by male healthcare professionals, (c) whether the defendants' policy, pattern and practice subject female prisoners in NYCDOC custody to a substantial and unreasonable risk of harm due to delayed and/or denied access to timely medical care, and (d) whether the defendants' policy, pattern and practice place undue hardship on female prisoner's exercise of their sincerely held religious beliefs. These policies, patterns, and practices include whether the assignment of male healthcare professionals to perform intimate examinations on female prisoners without adequate supervision and a female chaperone present creates an unreasonable risk of sexual misconduct and leads to recurrent and ongoing violations of the prisoners' rights to timely medical care and an invasion of privacy; whether appropriate screening is conducted to avoid assignment of male healthcare

---

[7] In the New York City Criminal Justice report of February 2018, defendant City acknowledges that the average daily jail population in January 2014 was 11,089 and 9,060 in February 2018 (of which 6% are women). This would equate to an average daily female population ranging from 665 in 2014 to 543 in 2018 assuming no increases during that span. Given prisoner turnover (the average length of stay for all inmates is 68 days), it is reasonable to assume that thousands of women were confined to RMSC during the relevant time period.

professionals to RMSC instead of available female healthcare professionals; whether appropriate training of staff is provided concerning sexual misconduct and staff's responsibility to report it when observed or when they have reason to believe it has occurred; whether staff is supervised adequately in NYCDOC facilities to prevent sexual misconduct; whether an available, consistent and confidential complaint mechanism for complaints of sexual misconduct is provided which allows female prisoners to come forward with complaints of sexual misconduct safely and without fear of retaliation; whether complaints of sexual misconduct by staff are adequately investigated; and whether appropriate action is taken against staff about whom complaints of sexual misconduct have been lodged, including by removing them from the opportunity to have unchaperoned contact with female prisoners. As a result, every woman confined to RMSC risks being subjected to these unlawful practices. The claims and practices alleged in this Complaint are common to all members of the class. The violations suffered by the named plaintiffs are typical of those suffered by the class. The entire plaintiff class will benefit from the injunctive, declaratory, and compensatory relief sought. The defendants have acted, or failed to act, on grounds generally applicable to the class, thereby making appropriate any and all relief with respect to the class as a whole.

d.   Adequacy: Plaintiffs are adequate representatives of the class because her interests do not conflict with the interests of the class members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously. The interests of the class members will be fairly and adequately protected by Plaintiffs and their counsel.

e.   Superiority: The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the class members. Each individual class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish each defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Furthermore, the claims of the individual members of the class may not be sufficiently large enough to warrant vigorous individual prosecution considering all of the concomitant costs and expenses thereto. As the damages suffered by each individual member of the class may be relatively small, the expense and burden of individual litigation would make it difficult or even impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of defendants' liability. Class treatment of the liability issues will ensure that all claims and claimants are

before this Court for consistent adjudication of the liability issues.

## FIRST CLAIM FOR RELIEF:
### 42 U.S.C. §1983
_____

67.     Plaintiffs repeat, reiterate and reallege each and every allegation of paragraphs "1" through "66", inclusive, of this Amended Complaint, as if same were fully set forth herein.

68.     As set forth above, the defendants maintain an unconstitutional chaperone policy that is grossly inadequate to reduce the risk of sexual abuse by male healthcare professional against female prisoners as it is arbitrarily limited to intimate examinations when there is substantial evidence in the defendants' possession and public domain that sexual abuses can and have just as easily occurred during "non-intimate" examinations.

69.     As set forth above, the defendants maintain unconstitutional policies and practices that recklessly deny and/or delay the plaintiffs and putative class members' access to adequate and timely medical care.

70.     As set forth above, the defendants maintain unconstitutional policies and practices that recklessly force female inmates to choose between (a) the risk of sexual abuse if undergoing an examination with a male healthcare professional without a female chaperone and (b) the risk of prolonged pain and/or deterioration if refusing an examination until a chaperone or female healthcare professional is available.

71.     As set forth above, the defendants maintain unconstitutional policies and practices that force female inmates to choose between (a) their sincerely held religious beliefs, customs and tenets that prohibit them from exposing their bodies to men without a female present and (b) the risk of prolonged pain and/or deterioration if refusing an examination until a chaperone or female healthcare professional is available.

72.     Through prior allegations and investigations, the defendants knew or should have known that male healthcare professionals subject female prisoners (victims of prior sexual assault in particular) to recurrent and ongoing acts of rape and other sexual abuse, including forced sexual intercourse, oral sexual acts, sexual touching, gratuitous internal pelvic examinations, demeaning sexual comments, and physical and verbal intimidation to deter inmates in custody from reporting such sexual abuse, but have failed to take reasonable measures to prevent or curb this pattern of abuse.

73.     Despite prior allegations and investigations, the defendants permit male healthcare professionals virtually unfettered access to female inmates and unmonitored examination areas where they can rape and sexually abuse inmates with minimal risk of detection.

74.     The defendants have failed to employ obvious measures to reduce the risks of denying and/or delaying medical care, including but not limited to the worsening of the condition itself and/or the increased risk of future harm, by modifying their chaperone policy to require a chaperone be present for all examinations by male healthcare professionals of female prisoners rather than just intimate examinations; hiring and staffing more female healthcare professionals and chaperones in the women's jail; and placing a priority on assigning female healthcare professionals to the women's jail.

75.     As set forth above, the defendants have recklessly failed to act despite being actually aware of the substantial risks that serious harm will result to the plaintiffs and putative class members.

76.     The plaintiffs and putative class members have been caused to suffer prolonged and extreme pain and discomfort, degeneration, and future harm as a result of the delays in

medical care set forth above. Defendants were aware of the substantial risks that could befall the plaintiffs and putative class members due to their inaction, failure, and/or refusal to provide chaperones and/or female healthcare professionals in each instance yet they failed to modify their policies, practices, training, hiring and staffing.

77.     As set forth above, the defendants, by their policies, practices, acts, and omissions, have violated the plaintiffs and putative class members' rights secured by the First, Fourth, Eighth and Fourteenth Amendments of the United States Constitution to be free from cruel and unusual punishment; to be free from the unnecessary and wanton infliction of pain and emotional and physical injury; to be free from violations of their bodily integrity and privacy; to competent and timely medical care; and to the freedom of their religion.

**SECOND CLAIM FOR RELIEF:**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**
_____

78.     Plaintiffs repeat, reiterate and reallege each and every allegation of paragraphs "1" through "77", inclusive, of this Amended Complaint, as if same were fully set forth herein.

79.     Upon information and belief, the plaintiffs and some of the putative class members are "qualified individuals with a disability," as that term is defined by Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12131(2).

80.     At all times herein mentioned, defendants City and NYCHHC are "public entities," as that term is defined by Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12131(1)(a) and (b).

81.     The defendants' chaperone policy and failure to staff and assign an adequate number of female healthcare professionals to RMSC have a discriminatory and disparate impact on the disabled and chronically ill as they require more frequent physical examinations and, at

times, have greater risks to their health if they elect not to proceed with the unchaperoned examination by a male healthcare professional, in violation of Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

82.     By reason of the discriminatory acts and omissions of these defendants, the plaintiffs and putative class members were caused to experience severe physical and psychological pain and suffering, and in other respects, were damaged.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury of all issues in this matter.

## **PRAYER FOR RELIEF**

As a result of the defendants' policies, practices, acts and omissions, Plaintiffs and the putative class members have suffered and will continue to suffer irreparable injury, including sexual assault, abuse and harassment, pain, shame, humiliation, degradation, emotional distress, embarrassment, psychological distress, and violation of their religious beliefs, customs and tenets.

**WHEREFORE**, the plaintiffs and the putative class members respectfully request this Court grant the following relief jointly and severally as against all of the defendants:

1. Declare that the chaperone policies, practices, actions and omissions of the defendants as described above violate the rights of the plaintiffs and the putative class members under the First, Fourth, Eighth and Fourteenth Amendments to the United States Constitution;

2. Declare that understaffing female healthcare professionals at RMSC as described

above violates the rights of the plaintiffs and the putative class members under the First, Fourth, Eighth and Fourteenth Amendments to the United States Constitution;

3. Declare that the chaperone policy and understaffing have a discriminatory effect and disparate impact on disabled and chronically ill female prisoners, in violation of the Americans With Disabilities Act;

4. Require the defendants and their successors, agents, servants, employees, and those in active concert or participation with them, to formulate, implement and enforce a new chaperone policy to remedy and put an end to the pattern of sexual misconduct against female prisoners in NYCDOC's jails. Such a remedy should include measures which would address continuing deficiencies in the assignment, selection, training and supervision of male healthcare professionals in performing examinations on female prisoners; staffing adequate female healthcare professionals to examine female prisoners and/or act as chaperones for all examinations by male healthcare professionals; in the defendants' complaint and investigatory practices; and in the provision of mental health treatment to women who have suffered sexual trauma as described earlier in this complaint;

5. Award the plaintiffs and putative class members compensatory and punitive damages in an amount to be determined at trial against each defendant;

6. Retain jurisdiction in this case until the unlawful conditions, practices, policies, acts and omissions complained of herein no longer exist and this Court is satisfied that they will not recur;

7. Award plaintiffs the costs of this action, including reasonable attorneys' fees, expert

fees, costs and disbursements; and

8. Grant such other and further relief as this court deems just and proper.

Dated: Brooklyn, New York
August 15, 2018

Yours, etc.,

**HELD & HINES, L.L.P.**
*Attorneys for Plaintiffs*
2004 Ralph Avenue
Brooklyn, New York 11234
(718) 531-9700
phines@heldhines.com

By: _____/s/_____
Philip M. Hines, Esq.